UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

B.H., a minor child, by and through her natural )
parents and guardians, BILLIE AND JACKIE )
HOLDER, et al., )
)
      Plaintiffs, )
)
v. )     Case No. 04-CV-0564-CVE-PJC
)
GOLD FIELDS MINING CORPORATION, )
et al., )
)
      Defendants/Third Party Plaintiffs, )
)
v. )
)
UNITED STATES OF AMERICA, et al., )
)
      Third-Party Defendants. )

## OPINION AND ORDER

Now before the Court are Defendants Blue Tee Corp. and Gold Fields Mining Corporation's

Motion for Partial Summary Judgment (Dkt. # 360) and Supplement to Blue Tee and Gold Field's

Motion for Partial Summary Judgment (Dkt. # 421).

## I.

The Tar Creek Superfund Site ("Tar Creek") is located in a 40 square mile area of

northeastern Oklahoma that was historically the site of lead and zinc mining throughout the

twentieth century. Tar Creek includes the communities of Picher, Cardin, Commerce, Quapaw, and

North Miami in Ottawa County, Oklahoma. This case was brought on behalf of minor children

residing in Picher and Cardin who allege that defendants' mining activities contaminated their

communities and caused children to suffer permanent neurocognitive disabilities due to lead

poisoning. Plaintiffs claim that defendants' actions constitute public and private nuisance under

Oklahoma law, and plaintiffs seek injunctive relief, and actual and punitive damages. Defendants Blue Tee Corp. ("Blue Tee") and Gold Fields Mining Corporation ("Gold Fields") have filed a motion for partial summary judgment on plaintiffs' claim for injunctive relief and plaintiffs' claims for public and private nuisance to the extent defendants' activities occurred on restricted Quapaw lands.

**Historical Mining Activities at Tar Creek**

Early in the twentieth century, significant deposits of lead and zinc were discovered in southeastern Kansas and northeastern Oklahoma. Originally, mining activities were relatively small operations, but in the 1920s larger mining companies operated in the Tar Creek area. The defendants in this case are successor entities. Blue Tee is the successor to American Zinc, Lead & Smelting Company ("American Zinc"), and Gold Fields was formerly known as Tri-State Zinc, Inc. ("Tri-State"). Mining companies removed ore from the ground, stripped the ore of any valuable metals, and deposited waste material on the surface. Millions of tons of waste were left in Tar Creek in the form of chat piles and tailings ponds. Defendants assert that their companies were responsible for a minimal amount of the lead waste left behind in Tar Creek.[1]

The mining companies generally did not own the land, but obtained sub-surface leases or contracts to remove lead and zinc ore from the ground.[2] Some of the land in northeastern Oklahoma

---

[1]     Plaintiffs assert that Blue Tee produced 7.8 million tons of ore, and Gold Fields produced 450,000 tons. In addition, plaintiffs claims that Blue Tee remilled 131,000 tons of ore and Gold Fields remilled more than 18.2 million tons of ore. However, plaintiffs do not place these numbers in the context of the overall ore production in the region.

[2]     Gold Fields admits that Tri-State owned "a small portion of the land surface in Section 16-T29NR23E." Dkt. # 360, at 4. Plaintiffs claim that Gold Fields currently owns 150 acres in the northern part of Picher, and that this land is a significant source of lead contamination in Picher. However, it does not appear that Blue Tee owns any property within Tar Creek.

was owned by members of the Quapaw Tribe in the form of allotments from the federal government, and this land was subject to federal regulation by the Department of Interior. In order to lease subsurface rights to restricted Quapaw land, mining companies had to execute a form lease approved by the Department of Interior and abide by certain federal regulations. Tri-State operated the White Mine from 1927 to 1930, and it later opened the Ottawa Mill in 1929 to remill chat from the White Mine. In 1932, Tri-State obtained permission to remove tailings from restricted Quapaw land leased by the Eagle Picher Company ("Eagle Picher") and remill the tailings at the Ottawa Mill. The Department of Interior required Tri-State to execute tailings retreatment contracts to remove tailings from Quapaw land. The contracts provided that Tri-State could remill tailings removed from the property under the following conditions:

a. [Tri-State may] remove therefrom for the purpose of remilling and cleaning the tailings, chats and sands hereinafter described.

b. [Tri-State], by proper means of transportation to be by it selected, may haul and transport the chat and tailings in the [designated pile] to its mill or concentrating plant . . . where such material may be mixed and co-mingled with other like material for purposes of extracting the metallic content thereof.

c. Tailings and other waste material resulting from said operation shall be allocated to each respective tract equal to the tonnage removed therefrom less concentrates extracted and first party agrees to store the same free of charge to the landowner with the right and privilege to the landowner to enter and remove the same.

d. Party of the second part . . . shall so pile the tailings and other waste material on the mill site so as not to interfere with the mine operations on this land.

e. The right is reserved in the Secretary of the Interior and to the Superintendent of the Quapaw Agency . . . to inspect and check said operations at any and all reasonable times for the purpose of ascertaining whether the provisions of the Department of Interior regulations and the terms and provisions of this agreement are being complied with . . . .

Dkt. # 360, Ex. 17, at 27.  In 1935, Tri-State constructed the Sooner Mill for the purpose of expanding its remilling operations.  The Sooner Mill was located in the northwest quarter of Section 16, T-29-N, R-23-E and the land consisted entirely of allotments owned by Quapaw Indians.  After 1935, Tri-State entered additional tailings retreatment contracts with members of the Quapaw tribe. Between 1929 and 1947, Tri-State processed tailings from the following locations within Quapaw territory: (1) all of section 16, T-29-N, R-23-E; (2) NE/4 of section 21, T-29-N, R-23-E; (3) NE/4, NW/4 of section 21, T-29-N, R-23-E; (4) SE/4 of SE/4 of Section 17, T-29-N, R-23-E; (5) SE/4 of SW/4 of Section 17, T-29-N, R-23-E, (6) NW/4 of SW/4 of Section 17, T-29-N, R-23-E; and (7) SE/4 of NW/4 of Section 17, T-29-N, R-23-E.[3]

American Zinc obtained subsurface leases in Ottawa County when it purchased the assets of the Nellie B. Company in October 1951, including the following leases on restricted Quapaw land: (1) the Thomas Buffalo Allotment - NW/4 and NE/4, SW/4 Section 28, T-29-N, R-23-E; (2) Buffalo Calf Allotment - NE/4, Section 28, T-29-N, R-23-E; (3) Frank Buffalo Allotment - SE/4, and SE/4, SW/4 Section 28, T-29-N, R-23-E; (4) Mary Calf Allotment - W/2, SW/4 Section 28, T-29-N, R-23-E, E/2, SE/4, and NW/4, SE/4 Section 29, T-29-N, R-23-E.  American Zinc also entered into an agreement with Eagle Picher to sell chat from the Eagle Picher Central Mill.  From 1951 to 1973, the remilling operations of American Zinc took place at the Barbara J and Rialto Mills.

---

[3]     For purposes of defendants' summary judgment motion, it is undisputed that defendants processed tailings from at least these locations.  These locations are relevant to defendants' argument that it conducted mining activities within Quapaw territory that were subject to federal regulation.  Plaintiffs mention several other areas where defendants actively mined for the purpose of showing that defendants engaged in more extensive mining than the motion for summary judgment indicates.

Remilling produces tailings and chat, which are byproducts of the remilling process. Chat and tailings were deposited on the surface. Defendants claim that they were contractually bound to leave the byproducts on the surface, but plaintiffs dispute this claim. Plaintiffs claim that mining companies left chat on the surface with the intent to extract more lead from the chat as remilling technology improved. They also claim that defendants' contracts permitted them to store lead waste in a manner that would have prevented contamination from lead dust. Defendants claim that the Ottawa, Sooner, and the Barbara J and Rialto Mills were "subject to control by the Department of Interior."[4] Dkt. # 360, at 22.

## The Tar Creek Superfund Site

In 1983, the Environmental Protection Agency ("EPA") placed approximately 40 square miles of northeastern Oklahoma on the National Priorities List ("NPL"), and the area was designated as the Tar Creek. The EPA notified mining companies that they could be held liable as potentially responsible parties ("PRPs"), and the EPA launched an investigation into the lead contamination found in the groundwater and surface contamination in the region. In 1991, the EPA entered a consent decree with several PRPs, including Gold Fields and Blue Tee, requiring payment of $1,273,000 for the investigation and remediation of groundwater and surface water in Tar Creek. Subsequently, in 1993, the Indian Health Service conducted a study of children in Ottawa County, and found that 35% of children had blood lead levels exceeding the Center for Disease Control

---

[4]     Defendants claim that the Department of Interior, through the United States Geological Survey, conducted annual inspections of mining operations from 1923 to 1954. The purpose of these inspections was to "ascertain if the mines and mills were being efficiently operated to conserve the interests of the Indian owners of ore." Dkt. # 362, Ex. 27, at 19.

("CDC") minimum level of concern.[5]  The EPA acknowledged as early as 1994 that many children in Tar Creek had elevated blood lead levels, and it determined that additional investigation was necessary.

In September 1994, the EPA requested additional information from PRPs regarding the sources and cause of lead contamination.  Specifically, the EPA requested:

> information relating to the identification, nature, and quantity of materials which have been generated, produced, treated, stored, or disposed at the Site or transported to the Site; information relating to the nature or extent of the release or threatened release of hazardous substances or pollutants or contaminants at or from the Site; and information relating to the ability of certain persons to pay for or to perform cleanup activities at the Site.

Dkt. # 361, Ex. 7, at 1.  The EPA notified Blue Tee and Gold Fields in August 1995 that it was planning soil remediation at Tar Creek, and asked whether the mining companies were willing to enter an agreement with the EPA.  Blue Tee and Gold Fields refused to cooperate with the EPA's cleanup efforts.[6]  The EPA's initial remediation efforts focused on soil removal near selected high access areas but, on March 21, 1996, the EPA expanded its activities to include soil remediation near residential homes.  The EPA renewed its "invitation" to the defendants to assist with the costs of soil remediation, but the EPA admitted that it did not have any new evidence linking Blue Tee or Gold Fields to the lead contamination in Tar Creek.

---

[5]     In 1985, the threshold blood lead level for medical treatment was 25 ug/dL.  This level was lowered to 10 ug/dL in 1991.

[6]     Defendants suggest that the EPA volunteered to undertake the cleanup of Tar Creek without financial support from defendants.  However, the EPA began a remedial investigation, feasibility study, and remedial design ("RI/FS/RD") following defendants' failure to make a "good-faith offer."  Dkt. # 361, Ex. 11, at 1-2.

The EPA formally began removal actions in June 1996. Since that time, the EPA's activities can be broken four separate operable units of remedial action: (1) OU1 - monitoring of surface water and acid mine water discharges, and plugging wells to prevent additional contamination; (2) OU2 - soil sampling and remediation of residential areas; (3) OU3 - emergency removal action of soil from Eagle Picher laboratory; and (4) OU4 - RI/FS by the EPA, Blue Tee, and Gold Fields to determine feasible method to remove chat piles from Tar Creek region.[7] The EPA's remediation efforts at Tar Creek are still in progress.

## Community Health Action and Monitoring Program ("CHAMP")

In 1996, Blue Tee and Gold Fields, along with other mining companies, established the CHAMP program to identify causes of lead poisoning in Tar Creek. Defendants hired the University of Oklahoma Health Sciences Center to conduct research and report on its findings. The final work plan for CHAMP outlines the goals of the program:

> The goal of CHAMP is to identify modifiable causes of elevated blood lead levels and reduce lead exposure in children and pregnant women. CHAMP provides community education on lead health issues and strategies for reducing children's and pregnant women's lead exposure. CHAMP includes a one-year blood monitoring program of children and pregnant women to assess lead exposure in the communities and identify those individuals who should be targeted for reduction in lead exposure and for case management. Individually tailored educational guidance will be provided to pregnant women and families of children with high blood lead levels and to those who are identified at high risk of exposure based on a survey questionnaire. A thorough environmental assessment of soil, dust, and paint will also be conducted on the homes of all children and pregnant women with elevated blood lead levels and on a random sample of homes of those without elevated blood lead levels. In

---

[7] EPA documents show that PRPs initially refused the EPA's invitation to participate in OU4. The EPA offered to enter a consent decree with Blue Tee and Gold Fields in 1996 and 2000, but defendants declined both offers. Blue Tee and Gold Fields agreed to an Administrative Order on Consent ("AOC") with the EPA on Decmber 5, 2004, but the AOC does not suggest why defendants agreed to the AOC after refusing to participate in OU4 for eight years.

addition, environmental abatement of dust and paint lead sources will be conducted as necessary.

Dkt. # 421, Ex. C, at 1. Defendants asked the EPA to delay soil remediation work until the completion of CHAMP, but the EPA refused to reschedule soil removal actions.[8]

When CHAMP researchers completed their initial blood testing, they found that 38.3% of children in Picher and 62.5% of children in Cardin had a lead blood level in excess of the minimum level recommended for action by the CDC. The program sponsors requested copies of the data and also contacted researchers to schedule a meeting. CHAMP's principal investigator, Lorraine Malcoe, Ph.D., felt that direct contact with sponsors would violate professional ethics, and she refused to schedule to a meeting to discuss the results or the causes of lead poisoning suspected by researchers. She stated that program sponsors asked her to use her influence with families in Tar Creek to delay the EPA's cleanup and, when she refused, the sponsors threatened to pull funding for CHAMP. Plaintiffs characterize the CHAMP program as an attempt to buy research proving that chat piles and tailings ponds were not the cause of lead contamination in Tar Creek. Defendants respond that they were simply asking to be notified of the results of research they funded, and they did not attempt to exert any improper influence over the independent judgment of CHAMP researchers.

CHAMP sponsors renewed their request to the EPA to delay soil remediation work for at least five months until the researchers could evaluate all of the CHAMP data. The EPA rejected the

---

[8]    The EPA viewed CHAMP as a useful supplemental program to its soil remediation efforts, but it felt that the clean up should move forward. Defendants also requestes the EPA to consider the results of the CHAMP study before going forward with remediation. The EPA notified defendants it would permit them to submit any findings to the EPA, but found that the current risk of lead poisoning was "unacceptably high." Dkt. # 421, Ex. E, at 1-3.

mining companies' request to stop soil remdiation at CHAMP homes.  Although the EPA did not discourage the continuation of CHAMP, it reiterated its position that CHAMP was not a substitute for the EPA's cleanup efforts.  The mining companies also argued that remedation could adversely affect the CHAMP study.  However, the EPA was explicit that "the EPA does not believe that more data is needed to determine whether the Site requires remediation under Superfund."  Dkt. # 437, Ex. 121, at 2.  Given the immediate threat of lead poisoning, the EPA believed that delaying soil remediation while investigating sources of lead contamination, other than chat piles and tailings ponds, made little sense.  Although the EPA would not delay its work because of CHAMP, the EPA's correspondence suggests that it viewed CHAMP as a useful supplemental activity, especially to reduce the risk of lead poisoning at homes until soil remediation was completed.

CHAMP was plagued by tensions between researchers and sponsors.  Dr. Malcoe felt that the mining companies were asking her not to disclose research results to state and federal agencies, because the results were harmful to the public perception of CHAMP sponsors.  She admits that the educational aims of the program provided a significant benefit to the community, even though the EPA could not take full advantage of CHAMP research.  Plaintiffs have alleged that defendants intended to buy results through CHAMP to influence the EPA's decision to impose cleanup costs on PRPs.  They also claim that defendants intentionally disregarded CHAMP's findings and delayed the EPA's cleanup of Tar Creek, even though defendants knew of the potential harm to children if remediation did not occur quickly.  Defendants deny these allegations, and characterize CHAMP as an independent research program designed to assist the residents of Tar Creek through education and by prioritizing cleanup.

**II.**

9

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment.

Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendants argue that summary judgment should be granted for them on plaintiffs' claim for injunctive relief (abatement of the nuisance), because the Court can not order abatement in this case. Defendants raise three separate arguments on this issue: (1) under common law, the Court can not order defendants to remove chat piles when they do not own the land or the chat piles; (2) an order for abatement would conflict with the federal remedial scheme under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); and (3) the Court should invoke the doctrine of primary jurisdiction to prevent interference with an on-going administrative process.

## A.

Defendants claim that the Court does not have the authority to order abatement, because defendants do not own the chat piles or the land where the chat piles are located.  Plaintiffs respond that Oklahoma law authorizes the Court to order abatement against defendants, even though they do not currently own the land or the chat piles.  Plaintiffs propose that the Court could order injunctive relief, but stay its order until the landowners are joined as parties.

Oklahoma law provides a common law and statutory claim for private nuisance, and plaintiffs make claims under both theories.  See Nichols v. Mid-Continent Pipe Line Co., 933 P.2d 272, 276 (Okla. 1996) (recognizing that statutory nuisance claim incorporates, but does not abrogate, common law concepts of private or public nuisance); NBI Servs, Inc. v. Ward, 132 P.3d 619, 626 (Okla. Civ. App. 2005).  Nuisance is statutorily defined:

> A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:
>
> First.  Annoys, injures or endangers the comfort, repose, health, or safety of others; or

12

Second.  Offends decency; or

Third.  Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or

Fourth.  In any way renders other persons insecure in life, or in the use of property, provided, this section shall not apply to preexisting agricultural activities.

Okla. Stat. tit. 50, § 1.  Common law nuisance is defined more broadly as the "unwarrantable, unreasonable or unlawful use by a person of his own property to the injury of another."  Lyons v. McKay, 313 P.2d 527, 529 (Okla. 1957).  Under either a common law or statutory nuisance claim, a court may award money damages and injunctive relief against a defendant who created, maintained, or owns a nuisance.  Okla. Stat. tit. 50, §§ 5, 6, 13; Meinders v. Johnson, 134 P.3d 858, 868 (Okla. Civ. App. 2005).  However, neither statute nor common law clearly specifies whom the Court may order to abate a nuisance.

Both parties rely on Union Central Petroleum Corp. v. Jackson, 909 P.2d 131 (Okla. Civ. App. 1995), as the leading case in Oklahoma on the abatement of an environmental hazard.  In Union Central Petroleum, the Oklahoma Corporation Commission ("OCC") brought an administrative enforcement action against several oil companies that allegedly contributed to saltwater contamination in Cyril, Oklahoma by operation of a well.  Id. at 135.  The OCC's claims were tried before an administrative law judge ("ALJ"), and the ALJ found that there was no way to determine which defendant was primarily responsible for contaminating the municipal water supply.  Based on the OCC's regulations, the ALJ found that any defendant that contributed to the contamination of the aquifer could be held liable.  The ALJ ordered Union Texas Petroleum Corporation ("Union Texas"), Mobil Oil Corporation, ("Mobil"), and Citation Oil and Gas Company ("Citation") to share the cleanup costs.  Union Texas was the primary operator of the well from 1962

13

to 1970, when Mobil took over active operations at the well.  Mobil sold its interest in the well to

Citation in 1989.  The Oklahoma Supreme Court held that the OCC had exclusive jurisdiction under

the Oklahoma Controlled Industrial Waste Disposal Act, Okla. Stat. tit. 63, § 1-2001 et seq., to order

abatement of this nuisance, and the OCC was acting within its authority to order any party that

created, maintained or owned the alleged nuisance to remediate the site.  Id. at 138.  Citation argued

that the action should have been brought as a public nuisance action in state district court.  While

the district court had jurisdiction to hear the town of Cyril's claim for monetary damages, the

pendency of a civil action would not prohibit the OCC from exercising its exclusive jurisdiction to

order abatement.  Id. at 139.  The Oklahoma Supreme Court also found that the OCC had statutory

authority to order all defendants to abate the nuisance, because there was sufficient evidence to find

that each defendant contributed to the pollution of the town's aquifer.

This case is not particularly helpful in determining the limits of this Court's authority to

order abatement.  The OCC was given express statutory authority to order corrective action against

any "party responsible for the control of any salt water, crude oil or other deleterious substances."

Okla. Stat. tit. 29, § 7-401.  The Oklahoma Supreme Court stated that none of the parties contested

the OCC's authority to order abatement against all of the defendants, and the authority of the OCC

was not challenged on appeal.  Union Texas Petroleum, 909 P.2d at 138 n.9.  This case does not

discuss judicial authority to order abatement in an ordinary nuisance case but, rather, it examines

the limits of the OCC's administrative authority.  In dicta, the Oklahoma Supreme Court suggested

that once the administrative process was initiated, the town could seek money damages only from

the state district court.  Id. at 139 ("Although the district court does have jurisdiction to hear the

14

town of Cyril's damages action for nuisance, this does not prevent the [OCC] from proceeding to abate the existing contamination.").

Plaintiffs cite two cases from other states that have adopted a firm rule that any party that causes, creates, or maintains a nuisance can be ordered to abate the alleged nuisance. Gray v. Westinghouse Elec. Corp., 624 N.E.2d 49 (Ind. App. 1993); Kamke v. Clark, 67 N.W.2d 841 (Wis. 1955). However, the persuasive value of these cases is limited. Gray was decided by a lower state appellate court, and at least one federal district court in Indiana has declined to follow this decision.[9] Heath v. Wal-Mart Stores, Inc., 113 F. Supp. 2d 1294 (S.D. Ind. 2000). In Kamke, the Wisconsin Supreme Court held that a defendant had no authority to enter a dump to abate a nuisance but, under a specific Wisconsin statute, the plaintiff could obtain a warrant authorizing a sheriff to enter the dump to abate the nuisance. Kamke, 67 N.W.2d at 476. Kamke is clearly distinguishable from the present case, and it actually supports defendants' position that, in a nuisance case, a court can not order a defendant to abate a nuisance on property it has no authority to enter.

Although Oklahoma law permits a court to award damages against a defendant that does not control or own property, there is no clear law defining whether a court has the equitable authority to order abatement under these circumstances, nor does this Court need to predict what the Oklahoma Supreme Court would rule. Defendants have presented alternate arguments on the issue of injunctive relief, and the Court will consider whether federal law permits plaintiffs to proceed with their claims for abatement or if plaintiffs' claims for abatement should be stayed under the doctrine of primary jurisdiction.

---

[9]     Gray has not been adopted by the Indiana Supreme Court, nor has its holding been referenced in a published opinion by the courts of any other state.

15

**B.**

Defendants assert that they would be required to violate CERCLA if the Court were to order abatement in this case.  Plaintiffs respond that CERCLA does not limit the Court's authority to order abatement under a state law nuisance claim.  Defendants rely on 42 U.S.C. § 9622(e)(6), which provides:

> When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

The parties do not dispute that the EPA has undertaken a remedial investigation at the Tar Creek site, and that the EPA is currently remediating residential yards.  Defendants are asking the Court to find that section 9622 preempts the state law remedy of abatement, because the state law remedy comes into direct conflict with federal legislation.[10]

CERCLA is a comprehensive federal regulatory scheme that provides a regulatory process for cleaning up hazardous waste sites with the goal of restoring the environment. New Mexico, 467 F.3d at 1244.  The Supreme Court has stated that CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites.  Sections 104 and 106 provide the framework for federal abatement and enforcement actions. . . ."  Key Tronic Corp. v. United States, 511 U.S. 809 (1994).  CERCLA provides the EPA authority to investigate

---

[10]     Defendants do not actually argue preemption, but the Tenth Circuit has considered these same issues under the doctrine of preemption.  To be consistent with Tenth Circuit precedent, the Court finds that defendants' arguments should be construed as a motion for summary judgment on the theory that CERCLA preempts the state law remedy of abatement.  New Mexico v. General Elec. Co., 467 F.3d 1223 (10th Cir. 2006) (applying conflict preemption to determine if state law remedy for an unrestricted award of monetary damages was preempted by CERCLA).

potential environmental hazards and impose the costs of cleanup on all PRPs.  United States v. Bestfoods, 524 U.S. 51 (1998).  The statutory scheme leave no doubt that the EPA is responsible for investigating and authorizing remedial actions under CERCLA.  Id. at § 9604(a)(4) ("The President shall select remedial actions to carry out this section in accordance with section 9621 of this title").

However, CERCLA does not preempt all state regulation regarding the management of hazardous substances within the state.  Bedford Affiliates v. Sills, 156 F.3d 416, 426-27 (2d Cir. 1998); United States v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1455 (6th Cir. 1991).  CERCLA expressly states that "[n]othing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State."  42 U.S.C. § 9614(a).  The Tenth Circuit, consistent with other courts, has found that CERCLA does not preempt state law claims for public or private nuisance, even if selected remedies are preempted.  New Mexico, 467 F.3d at 1247-48 ("This is not to say the State's public nuisance and negligence theories of recovery are completely preempted in view of the ongoing remediation . . . ."); Stanton Road Associates v. Lohrey Enterprises, 984 F.2d 1015, 1022 (9th Cir. 1993) ("the express language of [CERCLA] defeats [defendant's] contention that CERCLA preempts a state law recovery"); Attorney General v. Thomas Solvent Co., 380 N.W. 2d 53, 59-60 (Mich. App. 1985) (holding that CERCLA was intended as gap filling legislation but did not preempt state law claims for nuisance).

Defendants' argument that section 9622(e)(6) precludes the Court from ordering abatement is misplaced, because it takes the statutory language out of context and distorts the meaning of the statute. The statutory language prevents PRPs from undertaking remedial action on their own initiative, in part, to prevent PRPs from asserting a contribution claim for cleanup costs not authorized by the EPA. Allied Corp. v. Acme Solvents Reclaiming, Inc., 691 F. Supp. 1100, 1109 (N.D. Ill. 1988); Macias v. Kerr-McGee Corp., 1993 WL 408357 (N.D. Ill. 1993). The Court could certainly order abatement and stay its ruling unless and until defendants obtain authorization from the EPA to commence removal of chat piles. Defendants have not shown that the statute should be used a bar to plaintiffs' claim for abatement, even if the Court would be forced to stay any order for injunctive relief. The summary judgment record is insufficient to show to the Court's satisfaction that abatement would be impermissible if proper approval from the EPA were obtained. Therefore, defendants' motion will be denied on this issue.

### C.

Defendants request that the Court dismiss plaintiffs' claim for injunctive relief under the doctrine of primary jurisdiction. They argue that the Court should defer to the EPA, because the EPA has substantial expertise remediating environmental hazards. Plaintiffs respond that, even if the Court invokes primary jurisdiction, the proper remedy is to stay their claims for injunctive relief.

The Supreme Court has recognized that there are circumstances when courts should avoid interference with an ongoing administrative process. Primary jurisdiction applies "where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." United States v. Western Pacific Railroad Co., 352 U.S.

59, 64 (1956).  There are two policy goals behind this doctrine: (1) to ensure "desirable uniformity in determinations of certain administrative questions;" and (2) to "promote resort to agency experience and expertise where the court is presented with a question outside its conventional experience."  Williams Pipe Line Co. v. Empire Gas Corp., 76 F.3d 1491, 1496 (10th Cir. 1996). If an administrative agency has primary jurisdiction over a matter, the proper course for a court is to stay the case until the administrative agency has completed its work.  Southern Utah Wilderness Alliance v. Bureau of Land Management, 425 F.3d 735 (10th Cir. 2005).  There is no fixed formula constraining a court's analysis, but the Tenth Circuit has suggested several factors to guide district courts when exercising their discretion to invoke primary jurisdiction.  Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1377 (10th Cir. 1989).

Both parties rely on Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Railway, 857 F. Supp. 838 (D. Kan. 1994).  The Court finds the five factors stated in that case (suggested by Supreme Court and Tenth Circuit precedent) helpful in considering whether primary jurisdiction should be applied: (1) whether the court is being called upon to consider factual issues outside the conventional experience of judges; (2) whether defendant could be subject to conflicting orders; (3) whether agency proceedings have already begun; (4) whether the agency has shown diligence in resolving the issue; and (5) the type of relief requested.  Id. at 841-43.  In Schwartzman, the plaintiff requested injunctive relief under theories of private and public nuisance, and the court stayed those claims until the EPA finalized its investigation and remedial plan.  The Court will apply the five factors stated in Schwartzman to plaintiffs' claims for injunctive relief in this case.

First, the factual issues that will have to be resolved to craft an order for injunctive relief are complex, and involve matters best left to the EPA for resolution.  In order to grant injunctive relief, the Court would have to authorize an investigation to determine the most reasonable method for abating the alleged nuisance caused by chat piles.  Contrary to plaintiffs' assertions, an order for abatement would not be as simple as ordering defendants to remove the chat piles once the EPA has completed its investigation.  Although it would not be impossible for the Court to craft an appropriate order, it would certainly require help from outside sources.  Plaintiffs argue that Oklahoma courts have frequently exercised their authority to order abatement in complex cases.  However, the types of factual issues raised in this case are ordinarily left to the EPA for resolution, and the Court would likely be duplicating the investigation that has been underway since 1982.  This factor favors abstention until the EPA resolves its investigation of Tar Creek.

Second, defendants would almost certainly be subject to conflicting orders from the Court and the EPA if the Court were to grant plaintiffs' claims for injunctive relief at this time.  The proper balance of judicial efficiency and administrative expertise in a specialized area such as environmental regulation favors abstention under this factor.  See Far East Conference v. United States, 342 U.S. 570, 574-75 (1952) ("Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.").  Defendants are already participating in OU4, and there is strong possibility that an order for abatement would conflict with the EPA remediation plan.  Plaintiffs respond that they are not asking the Court for any relief that would

conflict with OU4, but they are simply requesting abatement following completion of OU4.[11] However, plaintiffs do not suggest when the EPA's work in Tar Creek will be completed, and the Court is hesitant to order abatement when any such order might be stayed indefinitely. This would be very close to entering an advisory opinion on abatement, because it is unclear that the order would have any immediate effect.

Third, both parties admit that EPA has initiated an investigation of Tar Creek, and remediation is ongoing. Plaintiffs' primary argument as to this factor was that Doe Run was not participating in remediation, but that issue is now moot.[12] The EPA has been actively working at Tar Creek since 1982, and has instituted at least four separate operable units of remedial action. This factor strongly favors the invocation of primary jurisdiction. Loggerhead Turtle v. County Council of Volusia County, Florida, 148 F.3d 1231, 1260 (11th Cir. 1998) ("Invoking the primary jurisdiction doctrine would avoid a judicial solution that might conflict with the regulatory scheme already approved by the appropriate administrative agency."); CF Indus., Inc. v. Transcontinental Gas Pipe Line Corp., 614 F.2d 33, 35 (4th Cir. 1980) ("the advisability of invoking primary jurisdiction is greatest when the issue is already before the agency").

Fourth, the EPA has conducted extensive investigatory and remedial work at Tar Creek, and is currently engaged in large scale soil remediation efforts. Plaintiffs are understandably frustrated that Tar Creek has been listed as a Superfund site for over 20 years, and much work remains to be

---

[11]    Plaintiffs argued that abatement is necessary because The Doe Run Resources Corporation ("Doe Run") refused to participate in OU4. Now that Doe Run has settled, plaintiffs' need for injunctive relief has been greatly reduced, because Gold Fields and Blue Tee are already participating in OU4.

[12]    Doe Run has notified the Court that it has agreed to a settlement with plaintiffs, which is set for hearing on final approval.

done.  They cite one case criticizing the EPA in similar circumstances, <u>Davies v. National</u> <u>Cooperative Refinery Association</u>, 963 F. Supp. 990 (D. Kan. 1997), but, even in <u>Davies</u>, the district court still invoked primary jurisdiction even though the agency had begun remediation 13 years earlier.  <u>Id</u>. at 999.  The EPA has been working at Tar Creek for approximately 25 years, but this does not establish, by itself, a lack of due diligence by the EPA.  Given the amount of time the EPA has been working at Tar Creek, this factor weighs against invoking primary jurisdiction.

Fifth, the type of relief plaintiffs request weighs strongly in favor of invoking primary jurisdiction.  Primary jurisdiction will often be invoked when a plaintiff seeks injunctive relief, because there is the greatest likelihood that a court's order will interfere with administrative agency's proceedings.  <u>Shinault v. American Airlines, Inc.</u>, 936 F.2d 796, 804 (5th Cir. 1991) (permitting plaintiff to proceed with claim for monetary damages against airline carrier, but invoking primary jurisdiction to stay claim for injunctive relief); <u>Schwartzman, Inc.</u>, 963 F. Supp. at 998 ("the doctrine of primary jurisdiction is more readily applicable to claims for injunctive relief").  CERCLA grants the EPA authority to create a plan for remediation at Superfund sites, and the type of injunctive relief requested by plaintiffs falls squarely within the EPA's authority.  This factor weighs in favor of staying plaintiffs' claims for injunctive relief.

Based on the <u>Schwartzman</u> factors, the Court finds that plaintiffs' claims for injunctive relief should be stayed under the doctrine of primary jurisdiction.[13]  If the Court were to order abatement, the Court's order would almost certainly conflict with the EPA's efforts at Tar Creek.  The EPA

---

[13]     Defendants argue that plaintiffs' claim for injunctive relief should be dismissed, but Tenth Circuit precedent suggests a strong preference for entering a stay instead of dismissing claims without prejudice.  <u>See</u> <u>Southern Utah Wilderness Alliance</u>, 425 F.3d at 750-51; <u>Volkman v. United Transp. Union</u>, 73 F.3d 1047 (10th Cir. 1996); <u>Marshall</u>, 874 F.2d at 1377.

routinely handles these matters, and cleanup of environmental hazards falls soundly within the EPA's expertise.  Plaintiffs' claims for injunctive relief shall be stayed until the EPA relinquishes responsibility for the Tar Creek Superfund site.

## IV.

Defendants assert that they can not be held liable for any chat deposited on lands held by members of the Quapaw tribe, because they were statutorily required to do so.  They claim that Okla. Stat. tit. 50, § 4 immunizes them from liability for leaving chat and tailings on the surface of restricted Quapaw lands, because the federal government expressly authorized defendants' actions.  Section 4 provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance."  Id.  Plaintiffs respond that section 4 applies to claims for injunctive relief only, but that plaintiffs may still maintain an action for damages.  There are two leading cases from the Oklahoma Supreme Court interpreting this statute.

In E. I. Du Pont De Nemourts Powder Company v. Dodson, 150 P. 1085 (Okla. 1915), the Oklahoma Supreme Court ruled that a landowner could not maintain a claim for abatement against a powder company for storing explosives on neighboring land.  The defendant stored large quantities of blasting powder and dynamite approximately 400 to 600 yards from the plaintiffs' homes, but did so under the express supervision of a state administrative agency.  Id. at 1087.  There was no dispute that the defendant fully complied with state regulations for the storage of explosives.  Under a prior version of Okla. Stat. tit. 50, § 4, the court found that defendant had express authorization to maintain a powder house, and that plaintiffs could not sue for abatement of actions the legislature authorized for the public good.  However, the Oklahoma Supreme Court held that this statute applied only to the remedy of abatement:

It is true that, whilst the Legislature may legalize an act which might otherwise be a nuisance, it cannot authorize the taking or damaging of private property for public use without just compensation.  But plaintiffs' right to just compensation is not involved in this proceeding.  The sole relief sought herein is for the abatement of an alleged nuisance and this prayer cannot be granted . . . . Hence it has been held that, although a nuisance may be legalized, and therefore protected from indictment and against interference with it as a public nuisance, the one maintaining it may nevertheless be liable in damages to an individual for any damages he may sustain therefrom.

Id. at 1087-88.  The plaintiffs' claim for abatement of a nuisance was dismissed, because plaintiffs did not include a claim for monetary damages.

In a more recent case, the Oklahoma Supreme Court held that a city could not be held liable for nuisance when it constructed a drainage ditch with specific statutory authorization.  City of Bartlesville v. Ambler, 499 P.2d 433 (Okla. 1971).  The plaintiffs brought a nuisance claim to enjoin the construction of a drainage ditch near 14 residential properties.  The city planned to cooperate with Army Corp of Engineers in the construction of a drainage ditch that would alter the natural course of Turkey Creek.  Neighboring landowners objected to the proposed drainage ditch, because it would violate existing drainage easements and lower property values.  Id. at 434-35.  The Oklahoma Supreme Court refused to enjoin the construction of the ditch, because Oklahoma statutes permitted a city to cooperate with a federal agency for the proposed construction project.  Therefore, plaintiffs could not obtain an injunction.[14]

Defendants argue that their statutory authorization defense is applicable to claims for nuisance, regardless of the remedy sought by plaintiffs.  They argue that plaintiffs should have brought a claim under Okla. Const. Art. 2, § 23.  However, Du Pont does not support defendants'

---

[14]     The Oklahoma Supreme Court remanded to the trial court, because the city had not condemned the property that would be infringed upon by the ditch, nor had the city compensated plaintiffs for taking property under a theory of eminent domain.

24

contention, as the Oklahoma Supreme Court expressly rejected the English rule denying monetary damages when an alleged nuisance has been authorized by the legislature. Du Pont, 150 P. at 1087-88. Defendants would have the Court infer that the "proper action" for recovery of monetary damages falls under the Oklahoma Constitution. The Court finds that the plain language of Du Pont permits plaintiffs to seek damages under a nuisance theory, even if defendants were authorized to conduct mining activities on restricted Quapaw lands.

In addition, the statutory authorization cited by defendants does not attempt to regulate the environmental problems alleged by plaintiffs and does not contain the requisite specificity to plaintiffs' claims. Defendants cite several statutes related to the leasing of Quapaw land for mining purposes, including: (1) Act of June 7, 1897, 30 Stat. 72; (2) Act of March 3, 1909, 35 Stat. 751; (3) the Department of the Interior's 1921 regulations concerning use of allotted lands; (4) Act of March 3, 1931, 41 Stat. 26; (5) the form lease required by the 1921 regulations to obtain subsurface rights to Quapaw land; (6) the 1929 regulations from the Department of the Interior requiring mining companies to leave chat on the property of Quapaw Indians after ore was removed; (7) the 1934 regulations creating a new form lease and permitting mining companies to mill ore off-site. After reviewing all of the sources, the Court finds that none of the legislative or administrative acts authorized defendants to create an environmental hazard. In Du Pont, the legislature regulated the storage of explosive materials because, even though there were inherent dangers associated with explosives, the use of explosives was a necessary evil. The regulations cited by defendants are primarily concerned with protecting the economic interest of tribal members, but the Court can not find any legislative intent to regulate mining due to environmental concerns. The public policy

25

behind the regulation of mining activity on restricted Quapaw lands should not be construed as a legislative authorization of a nuisance, and Okla. Stat. tit. 50, § 4 is not applicable.

## V.

Defendants argue that summary judgment is proper in their favor on plaintiffs' claim for punitive damages, because there is no evidence that the mining defendants had knowledge of any dangers from lead contamination. Plaintiffs respond that the evidence produced during discovery shows that defendants' actions at least constitute reckless disregard under Okla. Stat. tit. 23, § 9.1. Plaintiffs cite 16 "highlights" supporting their claim for punitive damages.

After reviewing the evidence cited by plaintiffs, the Court notes several concerns with the type of evidence on which plaintiffs intend to rely to support their claim for punitive damages. It is clear that plaintiffs are not distinguishing between the mining defendants, Blue Tee and Gold Fields, and the lead mining industry as a whole. For example, plaintiffs cite historical documents suggesting that mining companies have known since the 1870s that lead constitutes a poison that poses a serious health risk. See Dkt. 432, Ex. 53, at 1 (letter from president of National Lead Company expressing concerns that ingestion of lead was harmful). Plaintiffs also cite minutes from the annual meeting of the Lead Industries Association expressing general concern that the lead mining industry was viewed less favorably than other types of mining industries. Plaintiffs characterize the response of mining companies, but not specifically the mining defendants in this case, to claims by the medical community of the risks of lead poisoning as attacks designed to mislead the public about legitimate health risks caused by lead contamination. For purposes of

26

summary judgment, the Court will consider what evidence plaintiffs have to raise a genuine issue of material fact that Blue Fields and Gold Tee recklessly disregarded a health risk to plaintiffs.[15]

Defendants rely heavily on the Supreme Court's decision in <u>State Farm Mutual Automobile Insurance Company v. Campbell</u>, 538 U.S. 408 (2003), that the Due Process Clause of the Fourteenth Amendment places procedural and substantive limits on a state's authority to assess punitive damages. The Utah Supreme Court upheld a $145 million award of punitive damages, even though the jury awarded compensatory damages of $1 million. Based in part on <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559 (1996), the United States Supreme Court held that the punitive damages were excessive under the Due Process Clause. However, the Supreme Court expanded on its ruling in <u>Gore</u>, and attempted to clarify the substantive limits on a state's power to authorize punitive damages. There are three general factors that should guide a court when reviewing an award of punitive damages: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the award of compensatory and punitive damages; and (3) the difference between the punitive damages award and other available criminal or civil penalties. <u>Campbell</u>, 538 U.S. at 418. The most important factor when reviewing an award of punitive damages is the reprehensibility of the defendant's conduct, and the court should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

<u>Id</u>. at 419.

---

[15]    The parties are advised not to construe the Court's ruling on summary judgment as an <u>in limine</u> ruling on the admissibility of evidence. The magistrate judge has ruled on the parties' motions in limine, and those rulings are not addressed in this opinion. The Court's discussion focuses on the relevance of certain evidence to its ruling on defendants' motion for summary judgment, but should not be relied upon in any other context.

Much of the Campbell opinion concerns judicial review of punitive damages following a jury verdict but, in dicta, the Supreme Court discussed evidentiary concerns that come into play when punitive damages are at issue.  In Campbell, the Supreme Court stated "out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the state where it is tortious, but that conduct must have a specific nexus to the specific harm suffered by plaintiff."  Id. at 422.  Campbell was explicit that a "defendant should be punished for the conduct that harmed the plaintiff, nor for being an unsavory individual or business."  Id. at 423.  Although the Supreme Court did not bar consideration of out-of-state evidence, it suggested that plaintiffs should not be allowed to use punitive damages to condemn a defendant for dissimilar bad acts that are unrelated to plaintiff's claim.

As discussed above, the Court has some concern that much of plaintiffs' evidence involves dissimilar, out-of-state conduct that was not directed towards plaintiffs.[16]  However, plaintiffs have submitted sufficient evidence to raise a genuine issue of material fact as to whether Gold Fields and Blue Tee acted with reckless disregard.  The summary judgment record contains deposition testimony and exhibits supporting plaintiffs' assertions that CHAMP researchers felt pressured to tailor their results in favor of defendants.  Dr. Malcoe testified that representatives of Gold Fields and Blue Tee encouraged her to bury research that supported a conclusion that lead from chat piles was a leading cause of problems in Tar Creek.  Plaintiffs' suggestion that defendants attempted to delay the EPA's research is subject to conflicting interpretations.  While the Court is not prepared to conclude that defendants' requests to delay the EPA's investigation are probative of reckless

---

[16]     Evidentiary issues related to plaintiffs' claim for punitive damages will be dealt with if the jury finds in phase one of the trial that defendants acted with reckless disregard.  The Court is not ruling at this time as to the admissibility of evidence under Campbell.

disregard, plaintiffs have submitted evidence which could lead to the inference that defendants may have had an improper motive to disrupt the EPA's ongoing investigation, or that defendants may have been aware of an increased risk to children if soil remediation near residences did not occur quickly.  This evidence is sufficient to raise a genuine issue of material fact as to reckless disregard for the safety of others, and defendants motion for summary judgment should be denied.

**IT IS THEREFORE ORDERED** that Defendants Blue Tee Corp. and Gold Fields Mining Corporation's Motion for Partial Summary Judgment (Dkt. # 360) and Supplement to Blue Tee and Gold Field's Motion for Partial Summary Judgment (Dkt. # 421) are **granted in part** and **denied in part**: plaintiffs' claims for injunctive relief are stayed under the doctrine of primary jurisdiction pending completion of the EPA's remediation of the Tar Creek Superfund Site; the motions are denied in all other respects.

**DATED** this 1st day of February, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT